RECEIVED
IN LAKE CHARLES, LA.

MAR 1 1 2015

TONY R. MOORE, CLERK
BY_____
DEPUTY

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | |
|---|---|
| CANTU SERVICES, INC., | *   CIVIL ACTION NO. 2:12-CV-1292 |
| | * |
| Plaintiff, | * |
| | * |
| V. | *   JUDGE MINALDI |
| | * |
| MELVIN LEE FRAZIER, ET AL., | * |
| | * |
| Defendants. | *   MAGISTRATE JUDGE KAY |

**********************************************************************

## MEMORANDUM RULING

Before the court is the Melvin Lee Frazier's ("Frazier") Motion for Summary Judgment [Doc. 144], to which Cantu Services, Inc., ("Cantu") has filed a Response [Doc. 150], to which Frazier has filed a Reply [Doc. 155]. For the following reasons, the defendants' Motion [Doc. 144] is **DENIED**.

## FACTS & PROCEDURAL HISTORY

The Randolph-Sheppard Act was enacted for the purpose of creating employment opportunities for blind persons by establishing a system by which the United States Department of Education is empowered to designate State Licensing Agencies ("SLAs") in each state which may then issue to blind persons licenses for the operation of vending facilities on federal property. *See* Randolph-Sheppard Act, 20 U.S.C. §§ 107-107e (2006) (the Act). *See also Cantu Services, Inc. v. Roberie*, 535 Fed. Appx. 342, 343 (5th Cir. 2013) (describing the Act). "In authorizing the operation of vending facilities on Federal property, priority [is] given to blind

persons licensed by a State agency as provided in [the] Act." 20 U.S.C. §§ 107(b), 107a(b) (2006). In Louisiana, the Louisiana Workforce Commission ("LWC") operates as the SLA.[1]

Mr. Eugene Breaud was the blind vendor licensed to provide food services at Fort Polk from 2001 until his death in 2011. During that time, Breaud partnered with the plaintiff in fulfilling that contract.[2] Immediately following Breaud's death, the plaintiff continued providing food services at Fort Polk in the absence of a blind vendor on an interim basis until Mr. Miles Kimball was temporarily awarded the position.[3]

When the plaintiff's contract was near expiration, the LWC announced that it would be accepting applications from licensed blind vendors for a permanent position; the announcement further stated that LWC would assist the blind vendor in finding and selecting a "teaming partner."[4] The licensed blind vendor and the selected teaming partner were then to collaborate in presenting a proposal to the federal government for a new contract for the provision of food services at Fort Polk.[5]

LWC then selected the defendant, Frazier, as the new licensed blind vendor.[6] Frazier informed the plaintiff that he was now the licensed blind vendor for Fort Polk, and the plaintiff alleges that Frazier "agreed that [the plaintiff] would be the teaming partner" for Fort Polk.[7] Frazier notified the plaintiff several weeks later that he, Frazier, had been notified by the

---

[1] *See* Am. Compl. [Doc. 18] ¶ 16 (*citing* LA. REV. STAT. ANN. §§ 23:1, 23:3022, 36:301, 36:309).
[2] *See id.* ¶¶ 19-20.
[3] *Id.* ¶ 20.
[4] *Id.* ¶ 23. According to the plaintiff's Amended Complaint, blind vendors fulfilling contracts under the Act often work with so-called "teaming partners"—food service consulting companies which assist the blind vendor in the food service operation. Am. Compl. [Doc. 18] ¶¶ 17-18.
[5] *Id.*
[6] Am. Compl. [Doc. 18] ¶ 24.
[7] *Id.* ¶ 25. *See also* Email from Melvin Lee Frazier to Robert Welch, Chief of Staff for Cantu Services, Inc., Sept. 15, 2011 [Doc. 18-4], at 2.

defendants that a meeting would be held to determine which of the potential teaming partners would ultimately be awarded the teaming partner position.[8]

Both the plaintiff and Blackstone Consulting, Inc. ("Blackstone"), gave presentations to Frazier and the LWC, in early October, 2011.[9] Shortly thereafter, the plaintiff was notified by Renee Ellender Roberie, Chief Financial Officer for the LWC, that the LWC did not "acknowledge or approve of" the email that Frazier had sent to the plaintiff. She further stated that Frazier "did not have the authority" to select the plaintiff as the teaming partner because, as was apparently stated in the initial vacancy announcement, the LWC "must approve all teaming partner agreements."[10]

Frazier and the LWC ultimately did not select the plaintiff as Frazier's teaming partner for the new Fort Polk contract.[11] The plaintiff alleges that the LWC and Frazier's denial of the plaintiff's services was "arbitrary and capricious and was not based on [the plaintiff's] past performance," qualifications, or "any other legitimate or rational basis."[12] In late October, 2011, Frazier and Blackstone, through the LWC, put forth a bid for the new long-term food service contract at Fort Polk.[13] The federal government thereafter awarded them the contract.[14]

Furthermore, the plaintiff also complains that it had been advised that it would be entering into a "bridge contract" between the expiration of the contract extension that was in place at the time of the filing of this suit, on June 30, 2012, and the commencement of the new long term Fort Polk contract.[15] However, on May 3, 2012, Kevin Monk, Executive Director of

---

[8] Am. Compl. [Doc. 18] ¶ 26.
[9] *Id.* ¶¶ 27-31.
[10] Letter from Renee Ellender Roberie to Ricardo Cantu, Oct. 21, 2011 [Doc. 18-10].
[11] Am. Compl. [Doc. 18] ¶35.
[12] *Id.*
[13] *Id.* ¶ 39.
[14] *Id.* ¶ 40.
[15] Am. Compl. [Doc. 18] ¶ 41.

Blind Services for the LWC, wrote an email to the plaintiff in which he indicated that the plaintiff's services would not be employed at Fort Polk during the "bridge contract" period.[16]

The plaintiff filed suit on May 18, 2012, under 42 U.S.C. § 1983.[17]  The plaintiff alleges violations of its equal protection and due process rights against all of the defendants, in both their official and personal capacities, and also asserts a breach of contract claim against Frazier.[18]  In its Amended Complaint [Doc. 18], in addition to Frazier, the plaintiff names as defendants Renee Ellender Roberie, Chief Financial Officer for the LWC; Curt Eysink, Executive Director of the LWC; Kevin Monk, Executive Director of Blind Services for the LWC; Joseph Burton,[19] as the LWC's Randolph-Sheppard Program Manager; Janell Bosarge, one of the managers of the LWC's Randolph-Sheppard Program; and Mark. S. Martin, Director of Rehabilitation Services for the LWC.[20]

## LAW & ANALYSIS

### I.    Summary Judgment

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is said to be "genuine" only where a "reasonable jury could return a verdict for the non-moving party." *Dizer v. Dolgencorp, Inc.,* No. 3:10-cv-699, 2012 U.S. Dist. LEXIS 24025, at *16 (W.D. La. Jan. 12, 2012) (citing *Fordoche, Inc. v. Texaco, Inc.,* 463 F.3d 388, 392 (5th Cir. 2006)).  "Rule 56[(a)] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

---

[16] Email from Kevin Monk to Mr. Cantu and Robert Welch, May 3, 2012 [Doc. 18-13], at 2.
[17] *See* Am. Compl. [Doc. 18] ¶¶ 45-77.
[18] *Id.*  ¶¶ 45-79.
[19] Mr. Burton was subsequently dismissed, without prejudice. *See* Order [Doc. 130]; FED. R. CIV. PRO. 41(a).
[20] Am. Compl. [Doc. 18] ¶¶ 2-7.

*Webber v. Christus Schumpert Health Sys.,* No. 10-1177, 2011 U.S. Dist. LEXIS 99235, at *14 (W.D. La. Sept. 2, 2011) (citing *Patrick v. Ridge,* 394 F.3d 311, 315 (5th Cir. 2004)).

In ruling upon a motion for summary judgment, the district court shall draw all inferences in a light most favorable to the nonmoving party. *Id.* at *3 n. 1 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (additional citation omitted)). However, the court will not, in the absence of proof, "assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)). "The non-movant cannot preclude summary judgment by raising 'some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or by only a scintilla of the evidence.'" *Cormier v. W&T Offshore, Inc.,* No. 10-1089, 2013 U.S. Dist. LEXIS 53416, at *18-19 (W.D. La. Apr. 12, 2013) (citing *Little,* 37 F.3d at 1075.

## II.   Breach of Contract

Frazier argues that he is entitled to summary judgment because (1) there was never any contract between Frazier and Cantu, and (2) even if there was a contract between Frazier and Cantu, the contract was subject to a suspensive condition.

### A. Existence of a Contract

The parties dispute whether there was a valid offer and acceptance sufficient to form a contract in this case. Frazier asserts that the parties had "always contemplated that any teaming partner contract would be detailed and in writing."[21] Cantu contends that it had a valid verbal agreement with Frazier.

A party claiming the existence of a contract has the burden of proving that the contract was perfected. *Enter. Prop. Grocery, Inc. v. Selma, Inc.,* 882 So.2d 652, 665 (La. Ct. App. 2004)

---

[21] Mem. in Supp. of Mot. for Summ. J. [Doc. 144-1], at 11.

(citing *Pennington Constr., Inc. v. R A Eagle Corp.*, 652 So.2d 637 (La. Ct. App. 1995)).   A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished.   LA. CIV. CODE art. 1906.   A contract is formed by the consent of the parties established through offer and acceptance.   LA. CIV. CODE art. 1927.

Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.   *Id.*   When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form.   LA. CIV. CODE art. 1947.

The authority cited by Frazier is not binding on this analysis.   *North Cent. Utils., Inc. v. Walker Cmty. Water Sys., Inc.*, 506 So.2d 1325, 1329 (La. Ct. App. 1987) (determining when a proposal in response to a bid qualifies as an offer and reasoning that such a proposal must reflect the intent of the author to give to the other party the right to concluding the contract by assent); *Eames v. James*, 452 So.2d 384, 386 (La. Ct. App. 1984) (same); and *Knipmeyer v. Diocese of Alexandria*, 492 So. 2d 550, 554 (La. Ct. App. 1986) (holding that a document that had no expression of intent by either plaintiff or defendant was not an offer).   There is similarly no evidence of an agreement in principle or letter of intent referring to a subsequent formal agreement.   *See, e.g., Jena Band of Choctaw Indians v. Tri-Millennium Corp., Inc.*, No. Civ.A. 98-0829, 2006 WL 335779, at *2 (W.D. La. Feb. 13, 2006).

In his deposition, Frazier stated that he emailed confirmation to Cantu to confirm that he would choose Cantu as his partner at Fort Polk.[22]   Subsequently, Frazier sent an email confirmation:

---

[22] Depo. of Melvin Lee Frazier [Doc. 144-3], at 15. Cantu confirms in his deposition that he asked Frazier to put his selection of Cantu in an email.   [Doc. 144-5], at 14.

> I, Lee Frazier, am sending this message to document my confirmation to Mr.
> Ricardo Cantu as per our conversation today by phone.  I'm looking forward to
> working with the team at Cantu Services and may we have a great working
> relationship I'm forwarding this through Mr. Welch because of an e-mail error I
> received upon my first attempt to contact you.  Again I'm sending this document
> to insure [sic] you and you're your team that you are my choice in a teaming
> partner for Ft. Polk.[23]

Later that day, Frazier also communicated to Joseph Burton, the Randolph Sheppard
Program Manager, that he had selected Cantu as his service provider.[24]  Frazier argues that he
was subsequently informed that he could not choose Cantu without going through a process
outlined by the State[25] and points to a letter sent by the Louisiana State Licensing Agency to
Cantu, which states that Frazier did not have the authority to enter a contract.[26]  However, Kevin
Monk acknowledged in his deposition that the licensed blind vendor had the ultimate say as to
who they wanted to be their teaming partner.[27]  The court finds that there is a genuine dispute as
to a material fact over whether an agreement between Frazier and Cantu existed that obligated
Frazier to select Cantu as his partner.

### B. Whether the Contract Was Subject to a Suspensive Condition

In support of his argument that even if a contract existed, it was subject to a suspensive
condition, Frazier cites the stipulations of the bid, which state, "The state licensing agency will
assist the selected manager in interviewing and selecting the teaming partner.  All teaming
partner agreements must be approved by the state licensing agency."[28]

A conditional obligation is one dependent on an uncertain event. LA. CIV. CODE art.
1767.  If the obligation may not be enforced until the uncertain event occurs, the condition is

---

[23] Email from Frazier to Robert Welch, Sept. 15, 2011 [Doc. 144-6].

[24] Email from Frazier to Joseph Burton, Sept. 15, 2011 [Doc. 144-7].

[25] Depo. of Joseph Burton [Doc. 144-8], at 5-6.

[26] RE: Louisiana State Licensing Agency Selection of Teaming Partner for Anticipated Fort Polk Contract [Doc. 144-11].

[27] Depo. of Kevin Monk [Doc. 150-3], at 7.

[28] Memo. [Doc. 144-2], at 2.

suspensive. *Id.* Conditions may be either expressed in a stipulation or implied by the law, the nature of the contract, or the intent of the parties. LA. CIV. CODE art. 1768. A condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment. LA. CIV. CODE art. 1772.

Frazier asserts that any contract between Frazier and a teaming partner had to be approved by the SLA, and the SLA never approved any alleged contract between Frazier and Cantu. Cantu contends that Frazier's interests were contrary to the fulfillment of the contract to select Cantu for the Fort Polk site and points to Frazier's anxiety about the approval of his transfer as evidence.[29] Whether the SLA would have ultimately approved the contract between Frazier and Cantu is unknown because Frazier never submitted the contract to the SLA for approval. After the presentations were given, Frazier selected Blackstone as his teaming partner. The court also finds that there is a question of fact as to whether Frazier's selection of Cantu was subject to a fulfilled suspensive condition.[30]

Lake Charles, Louisiana, this *10* day of _____March_____, 2015.

_____
PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

---

[29] Memo. in Opp. to Frazier's Mot. for Summ. J. [Doc. 150], at 11 (citing Depo. of Melvin Lee Frazier [Doc. 150-4], at 41-42).
[30] There is, of course, a distinction between Frazier's obligation to select Cantu, and the SLA approval of the terms of an agreement between Frazier and Cantu: the former being a unilateral promise to contract, and the latter being the contract itself.