RECEIVED
IN LAKE CHARLES, LA.
APR 10 2015
TONY R. MOORE, CLERK
BY_____
       DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| CANTU SERVICES, INC., | * CIVIL ACTION NO. 2:12-CV-1292 |
| Plaintiff, | * |
| v. | * JUDGE MINALDI |
| MELVIN LEE FRAZIER, ET AL., | * |
| Defendants. | * MAGISTRATE JUDGE KAY |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM RULING

Before the court is Kevin Monk, Renee Ellender Roberie, Mark S. Martin, Janell Bosarge, and Curt Eysink's ("the defendants") Motion to Dismiss [Doc. 33]. The court gave notice to the parties that this Motion would be converted and considered a motion for summary judgment [Doc. 169]. The defendants have filed a Memorandum in Support [Doc. 170], to which the Cantu Services, Inc. ("Cantu") has filed a Response [Doc. 175], to which the defendants have filed a Reply [Doc. 177]. For the following reasons, the defendants' Motion [Doc. 33] is **GRANTED**.

### FACTS & PROCEDURAL HISTORY

The Randolph-Sheppard Act was enacted for the purpose of creating employment opportunities for blind persons by establishing a system by which the United States Department of Education is empowered to designate State Licensing Agencies ("SLAs") in each state which may then issue to blind persons licenses for the operation of vending facilities on federal property. *See* Randolph-Sheppard Act, 20 U.S.C. §§ 107-107e (2006) ("the Act"). *See also Cantu Services, Inc. v. Roberie*, 535 Fed. Appx. 342, 343 (5th Cir. 2013) (describing the Act). "In authorizing the operation of vending facilities on Federal property, priority [is] given to blind

1

persons licensed by a State agency as provided in [the] Act." 20 U.S.C. §§ 107(b), 107a(b) (2006). There is dispute as to whether the Louisiana Workforce Commission ("LWC") or Louisiana Rehabilitation Services ("LRS") operates as the SLA in Louisiana.[1]

Mr. Eugene Breaud ("Breaud") was the blind vendor licensed to provide food services at Fort Polk from 2001 until his death in 2011. During that time, Breaud partnered with the plaintiff in fulfilling that contract.[2] Immediately following Breaud's death, the plaintiff continued providing food services at Fort Polk in the absence of a blind vendor on an interim basis until Mr. Miles Kimball was temporarily awarded the position.[3]

When the plaintiff's contract was near expiration, the LWC announced that it would be accepting applications from licensed blind vendors for a permanent position; the announcement further stated that LWC would assist the blind vendor in finding and selecting a "teaming partner."[4] The licensed blind vendor and the selected teaming partner were then to collaborate in presenting a proposal to the federal government for a new contract for the provision of food services at Fort Polk.[5]

LWC then selected the defendant, Melvin Lee Frazier ("Frazier"), as the new licensed blind vendor.[6] Frazier informed the plaintiff that he was now the licensed blind vendor for Fort Polk, and the plaintiff alleges that Frazier "agreed that [the plaintiff] would be the teaming partner" for Fort Polk.[7] Frazier notified the plaintiff several weeks later that he, Frazier, had

---

[1] See Am. Compl. [Doc. 18] ¶ 16 (citing LA. REV. STAT. ANN. §§ 23:1, 23:3022, 36:301, 36:309); but see Cantu's Mot. to Reconsider [Doc. 147-1] & Cantu's Resp. to defs.' Mot. for Summ. J. [Doc. 175], at 3, 7-8, 22.
[2] See id. ¶¶ 19-20.
[3] Id. ¶ 20.
[4] Id. ¶ 23. According to the plaintiff's Amended Complaint, blind vendors fulfilling contracts under the Act often work with so-called "teaming partners"—food service consulting companies which assist the blind vendor in the food service operation. Am. Compl. [Doc. 18] ¶¶ 17-18.
[5] Id.
[6] Am. Compl. [Doc. 18] ¶24.
[7] Id. ¶ 25. See also Email from Melvin Lee Frazier to Robert Welch, Chief of Staff for Cantu Services, Inc., Sept. 15, 2011 [Doc. 18-4], at 2.

been notified by the defendants that a meeting would be held to determine which of the potential teaming partners would ultimately be awarded the teaming partner position.[8]

Both the plaintiff and Blackstone Consulting, Inc. ("Blackstone"), gave presentations to Frazier and the LWC, in early October, 2011.[9] Shortly thereafter, the plaintiff was notified by Renee Ellender Roberie, Chief Financial Officer for the LWC, that the LWC did not "acknowledge or approve of" the email that Frazier had sent to the plaintiff.[10] She further stated that Frazier "did not have the authority" to select the plaintiff as the teaming partner because, as was apparently stated in the initial vacancy announcement, the LWC "must approve all teaming partner agreements."[11]

Frazier and the LWC ultimately did not select the plaintiff as Frazier's teaming partner for the new Fort Polk contract.[12] The plaintiff alleges that the LWC and Frazier's denial of the plaintiff's services was "arbitrary and capricious and was not based on [the plaintiff's] past performance," qualifications, or "any other legitimate or rational basis."[13] In late October, 2011, Frazier and Blackstone, through the LWC, put forth a bid for the new long-term food service contract at Fort Polk.[14] The federal government thereafter awarded them the contract.[15]

Furthermore, the plaintiff also complains that it had been advised that it would be entering into a "bridge contract" between the expiration of the contract extension that was in place at the time of the filing of this suit, on June 30, 2012, and the commencement of the new long term Fort Polk contract.[16] However, on May 3, 2012, Kevin Monk, Executive Director of

---

[8] Am. Compl. [Doc. 18] ¶ 26.
[9] *Id.* ¶¶ 27-31.
[10] Letter from Renee Ellender Roberie to Ricardo Cantu, Oct. 21, 2011 [Doc. 18-10].
[11] *Id.*
[12] Am. Compl. [Doc. 18] ¶35.
[13] *Id.*
[14] *Id.* ¶ 39.
[15] *Id.* ¶ 40.
[16] Am. Compl. [Doc. 18] ¶ 41.

Blind Services for the LWC, wrote an email to the plaintiff in which he indicated that the plaintiff's services would not be employed at Fort Polk during the "bridge contract" period.[17]

The plaintiff filed suit on May 18, 2012, under 42 U.S.C. § 1983.[18] The plaintiff alleges violations of its equal protection and due process rights against all of the defendants, in both their official and personal capacities, and also asserts a breach of contract claim against Frazier.[19] In its Amended Complaint [Doc. 18], in addition to Frazier, the plaintiff names as defendants Renee Ellender Roberie, Chief Financial Officer for the LWC; Curt Eysink, Executive Director of the LWC; Kevin Monk, Executive Director of Blind Services for the LWC; Joseph Burton,[20] as the LWC's Randolph-Sheppard Program Manager; Janell Bosarge, one of the managers of the LWC's Randolph-Sheppard Program; and Mark. S. Martin, Director of Rehabilitation Services for the LWC.[21]

## LAW & ANALYSIS

### I. Standard for Summary Judgment

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is said to be "genuine" only where a "reasonable jury could return a verdict for the non-moving party." *Dizer v. Dolgencorp, Inc.*, No. 3:10-cv-699, 2012 U.S. Dist. LEXIS 24025, at *16 (W.D. La. Jan. 12, 2012) (citing *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006)). "Rule 56[(a)] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

---

[17] Email from Kevin Monk to Mr. Cantu and Robert Welch, May 3, 2012 [Doc. 18-13], at 2.
[18] *See* Am. Compl. [Doc. 18] ¶¶ 45-77.
[19] *Id.* ¶¶ 45-79.
[20] Mr. Burton was subsequently dismissed, without prejudice. *See* Order [Doc. 130]; FED. R. CIV. PRO. 41(a).
[21] Am. Compl. [Doc. 18] ¶¶ 2-7.

*Webber v. Christus Schumpert Health Sys.,* No. 10-1177, 2011 U.S. Dist. LEXIS 99235, at *14 (W.D. La. Sept. 2, 2011) (citing *Patrick v. Ridge,* 394 F.3d 311, 315 (5th Cir. 2004)).

In ruling upon a motion for summary judgment, the district court shall draw all inferences in a light most favorable to the nonmoving party. *Id.* at *3 n. 1 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (additional citation omitted)). However, the court will not, in the absence of proof, "assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)). A district court is entitled to rely, in determining whether a genuine issue of material facts exists on a particular issue, only upon those portions of exhibits submitted specifically called to its attention by the parties. *See Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir. 1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment, especially where . . . the nonmoving party is well aware of the existence of such evidence.").

## II.     Qualified Immunity

42 U.S.C. § 1983 "provides a cause of action against an individual who, acting under color of state law, has deprived a person of a federally protected statutory or constitutional right." *Whittington v. Maxwell*, 455 Fed. Appx. 450, 455-56 (5th Cir. 2011) (citing 42 U.S.C. § 1983). "[Q]ualified immunity—which shields Government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights'—is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (internal citations omitted).

"Qualified immunity serves to ensure government employees are not impeded from their public work to defend frivolous actions." *Porter v. Valdez*, 424 Fed. Appx. 382, 386 (5th Cir. 2011) (citing *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). "When an officer argues that he is entitled to qualified immunity from suit, [the court] first view[s] the evidence 'in the light most favorable to the party asserting the injury' and decide[s] if 'the facts alleged show the officer's conduct violated a constitutional right.'" *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In order to overcome a claim of qualified immunity, a plaintiff must plead facts showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The district court, in its discretion, may consider either of the two prongs first. *Id.* (*citing Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

For a legal principle to be clearly established, there must be "controlling authority or a robust consensus of persuasive authority that defines the contours of the right in question with a high degree of particularity." *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012) (citation omitted). The statutory or constitutional question must be "beyond debate." *Id.* (citing *al-Kidd*, 131 S. Ct. at 2083). "Generalizations and abstract propositions are not capable of clearly establishing the law." *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011). The plaintiff bears the burden of proving that qualified immunity is inapplicable. *Waganfeald*, 674 F.3d at 483 (citing *Atteberry v. Nocona General Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005)).

A. **Whether Defendants Can Assert Qualified Immunity**

Cantu argues that the defendants' actions were *ultra vires* and therefore they cannot avail themselves of the protection of qualified immunity. It also contends that the defendants violated

several other "clearly established laws": (1) the Randolph-Sheppard Act and the corresponding Code of Federal Regulations; (2) the Louisiana Administrative Code; (3) the Anti-Kickback Act; and (4) multiple provisions of the Federal Acquisition Regulations.

"Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984). "Neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation of federal or state law unless *that statute or regulation* provides the basis for the cause of action sued upon." *Gagne v. City of Galveston*, 805 F.2d 558, 560 (5th Cir. 1986) (citing *Davis*, 468 U.S. at 194 n. 12) (emphasis in original). Therefore, allegations that the defendants violated the Anti-Kickback Act are irrelevant to determining whether they are entitled to assert the defense of qualified immunity. The same is true of the vague allegations of violations of the Federal Acquisition Regulations.

Turning to the allegations that the defendants exceeded their authority and they are therefore unable to assert the defense of qualified immunity, the pertinent issue is whether each defendant's actions were clearly established to be beyond the boundaries of his or her discretionary authority. *In re Allen*, 106 F.3d 582, 593 (4th Cir. 1997); *see also Johnson v. Phillips*, 664 F.3d 232, 236-37 (8th Cir. 2011); *Holloman ex rel. Holloman v. Harland*, 360 F.3d 1252, 1265-67 (11th Cir. 2004). "This test is objective, and examines what a reasonable official in the defendant's position would have understood the limits of his statutory authority to be." *In re Allen*, 106 F.3d at 593. The test is more than whether or not the official acted unlawfully; if that were the relevant inquiry, then "any illegal action would, by definition, fall outside the scope of an official's authority." *Id.* at 594.

In Cantu's original and amended complaints, it specified that the LWC was the SLA under the Rehabilitation Act and the Randolph-Sheppard Act.[22] Cantu has since changed course, and now claims that LWC is not the SLA under the Randolph-Sheppard Act. It references the Randolph-Sheppard Act in support of its argument:

> In any State having an approved plan for vocational rehabilitation pursuant to the Vocational Rehabilitation Act or the Rehabilitation Act of 1973 [29 U.S.C.A. § 701 et seq.], the State licensing agency designated under paragraph (5) of subsection (a) of this section shall be the State agency designated under section 101(a)(2)(A) of such Rehabilitation Act of 1973 [29 U.S.C.A. § 721(a)(2)(A)].

20 U.S.C. § 107(a)(e). It then alleges that Louisiana Rehabilitation Services ("LRS") is designated as the SLA under the State of Louisiana's State Plan ("the State Plan").[23, 24] Both parties agree that LRS is the designated state unit ("DSU") under the State Plan. This is consistent with Louisiana Revised Statute § 23:3022(8) which states that LRS may "[e]xercise all the duties and responsibilities of the designated state unit as defined by the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., as amended, and 34 CFR Part 361." LA. REV. STAT. § 23:3022(8).

However, a designated State agency under the Rehabilitation Act of 1973, 29 U.S.C. § 721(a)(2)(A) is the State agency designated as the sole State agency to administer the State Plan, and the Rehabilitation Act goes on to distinguish a designated state agency from a designated state unit. 29 U.S.C. §§ 721(a)(2)(A)-(B). The State Plan provides that the Office of Workforce

---

[22] Compl. [Doc. 1] ¶ 12 & Am. Verified Compl. [Doc. 18] ¶ 16.
[23] In its Memorandum in Support of Reconsideration [Doc. 147-1], incorporated into the instant motion by reference, Cantu also cites to the deposition of Kenneth Dale York, but his testimony is inconclusive. When asked whether the SLA was LRS, he responded affirmatively then qualified his statement with "depending on who you ask." Depo. of Kenneth Dale York [Doc. 147-5], at 3. The affidavit of Terry Camardelle and deposition of Joseph Burton are cited as well but are also insufficient to establish that the law is clearly established on this issue. *See* Pl.'s Ex. 1 Aff. of Terry Camardelle [Doc. 175-1]; and Pl.'s Ex. 2 Depo. of Joseph Burton [Doc. 175-2].
[24] However, Cantu also acknowledges that LRS is housed within the LWC. Cantu's Statement of Facts [Doc. 175-19], at 3.

Development[25] is to operate and administer the State Vocational Rehabilitation Services Program in accordance with the State Plan, and that the Executive Director of the Louisiana Workforce Commission has the authority under state law to receive, hold, and disburse federal funds made available under the State Plan. Pl.'s Ex. 22 State Plan [Doc. 150-22], at 1.2, 1.7. Additionally, the version of Louisiana Revised Statute § 36:309 in effect during the underlying facts of this dispute, transfers the "powers, duties, functions, and responsibilities relating to Louisiana Rehabilitation Services (R.S. 23:3001 et seq.) . . . to the Louisiana Workforce Commission, to be exercised and performed by the executive director . . . ."[26] LA. REV. STAT. § 36:309. Finally, the current federal contract for the Fort Polk vending services is between the LWC and the federal government.

Cantu has not shown that it was clearly established that the LWC lacked authority under the Randolph-Sheppard Act.[27] Therefore, it has failed to meet the burden of proof necessary to show that the defendants are not entitled to qualified immunity for acting outside the scope of their discretionary authority.

### B. Due Process Claims

In arguing that the defendants' actions violated its clearly established rights under the Due Process Clause, Cantu cites to three cases: *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 962-66 (D.C. Cir. 1980); *Transco Sec., Inc. of Ohio v. Freeman*, 639 F.2d 318, 321 (6th Cir. 1981); and *Ervin & Assocs., Inc. v. Dunlap*, 33 F. Supp. 2d 1, 9 (D.D.C. 1997). In *Old Dominion*, the plaintiff brought suit after being denied substantial government contracts because

---

[25] The Office of Workplace Development is an office within the LWC. LA. REV. STAT. § 36:308(B).
[26] While Cantu cites to 34 C.F.R. § 361.139(c)(2) to argue that the duties of LRS were improperly delegated to LWC, it cannot be said that in light of the foregoing that LWC's authority or lack thereof was clearly established. Therefore, the discretionary authority of its officers and employees was likewise not clearly established.
[27] In its complaints, Cantu references Louisiana Revised Statute § 36:309 to support its original assertion that LWC is the designated SLA. The court finds Cantu's subsequent reversal to be disingenuous, at the very least. Cantu is cautioned to be more forthcoming when presenting pertinent statutory authority in its arguments.

9

the government agency contracting officers determined that it lacked integrity and responsibility. *Old Dominion Dairy Prods., Inc.*, 631 F.2d at 955-56. The court in that case held that the contractor should have been given notice of the charges against it and the opportunity to respond to the charges before adverse action was taken. *Id.* The court in *Transco* came to a similar conclusion. *Transco Sec., Inc.*, 639 F.2d at 321 ("One who has been dealing with the government on an ongoing basis may not be blacklisted, whether by suspension or debarment, without being afforded procedural safeguards including notice of the charges, an opportunity to rebut those charges, and a hearing.") *Ervin* is substantially similar. *Ervin & Assocs., Inc.*, 33 F.Supp.2d at 9 (finding a property interest in a contract where there was interference by the defendant).

However, these cases do not represent a robust consensus of persuasive authority. Additionally, there is controlling authority that casts doubt on whether the cited decisions are applicable to these facts. In *Nobles Const., L.L.C. v. Washington Parish*, 544 Fed.Appx. 263 (5th Cir. 2013), the plaintiff argued that an individual's presence on the decision-making committee was improper and also made allegations that it was deprived of the opportunity to correct deficiencies in its proposal. *Id.* at 265-68. The court found neither a procedural due process violation nor a substantive due process violation. *Id.* Additionally, the Fifth Circuit has held that where an unsuccessful bidder may seek an immediate injunction through a summary proceeding, the injunction prevents deprivation of any "significant property interest" and is therefore an adequate pre-deprivation remedy. *Marco Outdoor Advertising, Inc. v. Regional Transit Authority*, 489 F.3d 669, 674 (5th Cir. 2007). The availability of a summary proceeding coupled with notice that the contract was to be awarded to a different party satisfied "the elements of the due process prong of the Due Process Clause." *Id.*

It cannot be said that the law is clearly established such that every reasonable person in the defendants' positions would have known that he or she was violating the plaintiff's constitutional rights under the Due Process Clause.[28] Cantu has not met its burden of showing that the qualified immunity defense is inapplicable to this claim.

### C. Equal Protection Claims

Aside from the arguments that the defendants' actions were *ultra vires* and therefore qualified immunity should not apply, Cantu cites to no case law to convince the court that the defendants' actions violated clearly established law under the Equal Protection Clause. Therefore, Cantu has failed to meet its burden in showing that qualified immunity is inapplicable to this claim.

### D. Claims for Violations of Federal and State Statutes

Although not previously alleged, Cantu seems to assert that it has valid § 1983 claims for violations of (1) the Randolph-Sheppard Act, 20 U.S.C. § 107 *et seq.*; (2) 34 C.F.R. § 361.13(b) and (c)(2); (3) 34 C.F.R. § 395.2(a); (4) the Rehabilitation Act, 29 U.S.C. § 721; (5) the Anti-Kickback Act, 41 U.S.C. § 8701 *et seq.*; (6) Federal Acquisition Regulations, FAR 52.203-13; (7) Federal Acquisition Regulations, FAR 52.212-4(r); (8) Louisiana Administrative Code, LAC Title 67, Part VII, § 515; and (9) Louisiana Administrative Code, LAC Title 67, Part VII, § 515A.1, as well as common law limiting state agencies and officials in exercising only that power authorized by law.[29] In its opposition to the defendants' motion, Cantu cites to case law that establishes that Section 1983 claims can arise from violations of federal law and places the

---

[28] The court also notes that it appears from the record that ample notice was provided to the plaintiff both at the time that the teaming partner position became open as well as at the time the plaintiff was notified via email that it would not be receiving the Fort Polk contract.

[29] Cantu's Resp. to the defs.' Mot. for Summ. J. [Doc. 175], at 3.

burden on the defendants to show that Congress intended to foreclose private enforcement.[30] These new claims are not properly before the court. *See Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). Even if these claims were properly before the court, the plaintiffs have failed to show how the defendants' actions violated the clearly established law under the named statutes.[31]

Lake Charles, Louisiana, this 27th day of March, 2015.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

---

[30] *Id.*, at 1-2.
[31] Additionally, the court notes that the plaintiffs have not shown the applicability of Section 1983 to claims arising under state law.