UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| CANTU SERVICES, INC., | * | CIVIL ACTION NO. 2:12-CV-1292 |
| | * | |
| **Plaintiff** | * | |
| | * | |
| V. | * | JUDGE MINALDI |
| | * | |
| MELVIN LEE FRAZIER, | * | |
| | * | |
| **Defendant** | * | MAGISTRATE JUDGE KAY |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM ORDER

Before the court are the Motion in Limine (Rec. Doc. 154) filed by Cantu Services, Inc. ("Cantu"), and the Daubert Motion (Rec. Doc. 202) filed by Cantu, and the Motion in Limine (Rec. Doc. 201) filed by Melvin Lee Frazier ("Frazier"). Frazier filed an Opposition (Rec. Doc. 210) to Cantu's motion in limine, and an Opposition (Rec. Doc. 209) to Cantu's Daubert motion. Cantu filed an Opposition (Rec. Doc. 208) to Frazier's motion in limine, and Frazier filed a Reply (Rec. Doc. 215). For the following reasons, Cantu's motion in limine (Rec. Doc. 154) is **DENIED**, Cantu's Daubert motion (Rec. Doc. 202) is **DENIED IN PART** and **GRANTED IN PART**, and Frazier's motion in limine (Rec. Doc. 201) is **DENIED IN PART** and **GRANTED IN PART**.

## FACTS & PROCEDURAL HISTORY

The Randolph-Sheppard Act was enacted for the purpose of creating employment opportunities for blind persons by establishing a system by which the United States Department of Education is empowered to designate State Licensing Agencies ("SLAs") in each state which may then issue to blind persons licenses for the operation of vending facilities on federal property. *See* Randolph-Sheppard Act, 20 U.S.C. §§ 107-107e (2006) (the Act); *see also Cantu*

1

*Servs., Inc. v. Roberie*, 535 F. App'x 342, 343 (5th Cir. 2013) (describing the Act). "In authorizing the operation of vending facilities on Federal property, priority [is] given to blind persons licensed by a State agency as provided in [the] Act." 20 U.S.C. §§ 107(b), 107a(b) (2006). In its amended complaint, Cantu asserted that in Louisiana the Louisiana Workforce Commission ("LWC") operates as the SLA, though it now disputes this.[1]

Mr. Eugene Breaud was the blind vendor licensed to provide food services at Fort Polk from 2001 until his death in 2011. During that time, Breaud partnered with Cantu in fulfilling that contract.[2] Immediately following Breaud's death, the plaintiff continued providing food services at Fort Polk in the absence of a blind vendor on an interim basis until Mr. Miles Kimball was temporarily awarded the position.[3]

When the plaintiff's contract was near expiration, the LWC announced that it would be accepting applications from licensed blind vendors for a permanent position; the announcement further stated that the LWC would assist the blind vendor in finding and selecting a "teaming partner."[4] The licensed blind vendor and the selected teaming partner were then to collaborate in presenting a proposal to the federal government for a new contract for the provision of food services at Fort Polk.[5]

The LWC then selected the defendant, Frazier, as the new licensed blind vendor.[6] Frazier informed the plaintiff that he was now the licensed blind vendor for Fort Polk, and the plaintiff

---

[1] *See* Am. Compl. (Rec. Doc. 18) ¶ 16 (citing LA. REV. STAT. ANN. §§ 23:1, 23:3022, 36:301, 36:309).
[2] See id. ¶¶ 19-20.
[3] *Id.* ¶ 20.
[4] *Id.* ¶ 23. According to the plaintiff's Amended Complaint, blind vendors fulfilling contracts under the Act often work with so-called "teaming partners"—food service consulting companies which assist the blind vendor in the food service operation. *Id.* ¶¶ 17-18.
[5] *Id.*
[6] *Id.* ¶ 24.

alleges that Frazier "agreed that [the plaintiff] would be the teaming partner" for Fort Polk.[7] Frazier notified the plaintiff several weeks later that he, Frazier, had been notified by the LWC that a meeting would be held to determine which of the potential teaming partners would ultimately be awarded the teaming partner position.[8]

Both the plaintiff and Blackstone Consulting, Inc. ("Blackstone"), gave presentations to Frazier and the LWC in early October, 2011.[9] Shortly thereafter, the plaintiff was notified by Renee Ellender Roberie, Chief Financial Officer for the LWC, that the LWC did not "acknowledge or approve of" the email that Frazier had sent to the plaintiff. She further stated that Frazier "did not have the authority" to select the plaintiff as the teaming partner because, as was apparently stated in the initial vacancy announcement, the LWC "must approve all teaming partner agreements."[10]

Frazier and the LWC ultimately did not select the plaintiff as Frazier's teaming partner for the new Fort Polk contract.[11] The plaintiff alleges that the LWC and Frazier's denial of the plaintiff's services was "arbitrary and capricious and was not based on [the plaintiff's] past performance," qualifications, or "any other legitimate or rational basis."[12] Cantu further alleges that the award of the teaming partner position to Blackstone was predicated, in whole or in part, on Blackstone's promise of a 10% donation to the Blind Vendors Trust ("Trust Fund").[13] The Trust Fund is statutorily established by Louisiana law, and Louisiana law controls its expenditures.[14] In late October, 2011, Frazier and Blackstone, through the LWC, put forth a bid

---

[7] *Id.* ¶ 25; *see also* Email from Melvin Lee Frazier to Robert Welch, Chief of Staff for Cantu Services, Inc., Sept. 15, 2011 (Rec. Doc. 18-4), at 2.
[8] Am. Compl. (Rec. Doc. 18) ¶ 26.
[9] *Id.* ¶¶ 27-31.
[10] Letter from Renee Ellender Roberie to Ricardo Cantu, Oct. 21, 2011 (Rec. Doc. 18-10).
[11] Am. Compl. (Rec. Doc. 18) ¶35.
[12] *Id.*
[13] *See* Memo. Ruling (Rec. Doc. 142), at 9; Memo. in Supp. of Mot. to Reconsider (Rec. Doc. 147-1), at 12-16.
[14] *See* Memo. Ruling (Rec. Doc. 142), at 9-10.

for the new long-term food service contract at Fort Polk.[15] The federal government thereafter awarded them the contract.[16]

Furthermore, the plaintiff also complains that it had been advised that it would be entering into a "bridge contract" between the expiration of the contract extension that was in place at the time of the filing of this suit, on June 30, 2012, and the commencement of the new long term Fort Polk contract.[17] However, on May 3, 2012, Kevin Monk, Executive Director of Blind Services for the LWC, wrote an email to the plaintiff in which he indicated that the plaintiff's services would not be employed at Fort Polk during the "bridge contract" period.[18]

Cantu filed suit against Frazier on May 18, 2012, for breach of contract.[19] On August 8, 2014, Cantu filed a motion in limine.[20] On December 11, 2015, Frazier filed a motion in limine,[21] and Cantu filed both a Daubert motion[22] and a motion to renew its previously filed motion in limine.[23]

## LAW & ANALYSIS

### CANTU'S MOTION IN LIMINE (REC. DOC. 154)

Cantu's motion in limine contains a laundry list of broad and generic objections which are best raised at trial as necessary. Thus, Cantu's motion is **DENIED.**

---

[15] Am. Compl. (Rec. Doc. 18) ¶ 39.
[16] *Id.* ¶ 40.
[17] *Id.* ¶ 41.
[18] Email from Kevin Monk to Mr. Cantu and Robert Welch, May 3, 2012 (Rec. Doc. 18-13), at 2.
[19] Compl. (Rec. Doc. 1) ¶¶ 62-64. Several other claims were filed against the LWC and various state officials as well, but those parties have all been terminated. *See* Mem. Ruling (Rec. Doc. 191); *see also* Stipulation of Dismissal (Rec. Doc. 129).
[20] Mot. in Limine (Rec. Doc. 154).
[21] Mot. in Limine (Rec. Doc. 201).
[22] Daubert Mot. (Rec. Doc. 202).
[23] Mot. in Limine (Rec. Doc. 203).

FRAZIER'S MOTION IN LIMINE (REC. DOC. 201)

*1.  Arguments that the LWC is not the SLA*

Frazier asserts that Cantu should be precluded from arguing that the LWC is not the SLA because the court rejected that argument in a previous memorandum ruling.[24] Cantu responds that the memorandum ruling only addressed the issue in the context of a qualified immunity analysis, and that there has not been any adjudication of the identity of the SLA. The court agrees that the previous memorandum ruling did not unequivocally hold that the LWC was the SLA. However, whether the LWC is the SLA is a question of law,[25] and the court need not wait until trial to resolve the issue. For the reasons stated in a memorandum previously filed by state officials,[26] the court finds as a matter of law that the LWC is the SLA in this matter. Thus, Cantu is precluded from making any arguments to the contrary during trial.

*2.  References to Kickbacks*

According to Frazier, the court has already concluded that Blackstone's continuing 10% donation to the Trust Fund is proper and not a "kickback," and thus any reference to "kickbacks" is irrelevant and prejudicial. Cantu responds that the court's analysis regarding the continuing 10% donation was made in the limited context of deciding whether Cantu's constitutional claims against state officials should be dismissed on the basis of qualified immunity. In a previous memorandum ruling, the court reasoned that the "funds were not to be given to the defendants, nor to any individual with any decision-making authority within the LWC [and the] proposed donation was openly discussed, in no way concealed, and there does not appear to have been anything illegal about this proposition."[27] In light of this reasoning and the above finding by the

---

[24] *See* Mem. Ruling (Rec. Doc. 191).
[25] Cantu classifies this as an issue of law in its Pretrial Statement (Rec. Doc. 214), at 4.
[26] Opp'n to Mot. to Reconsider (Rec. Doc. 151), at 9-16.
[27] Memo. Ruling (Rec. Doc.142), at 9. This ruling was vacated, but the rationale is sound.

court that the LWC is the SLA as a matter of law, it is not apparent how legal payments made by Blackstone are relevant in determining whether a contract was formed, or whether that contract had a suspensive condition. The court finds that any discussion of Blackstone's payments to the Trust Fund, whether referred to as "kickbacks" or otherwise, is irrelevant. FED. R. EVID. 401.

### 3. *Exclude Testimony and Opinions of Bailey*

Frazier argues that Bailey should not be permitted to testify because his opinions have nothing to do with Cantu's claims against Frazier.[28] Cantu responds that Bailey's testimony is relevant to Cantu's damage claims because it regards industry practices under federal public service contracts with respect to issues of past performance, contract extensions, and contract quality assurance and quality control processes. According to Cantu, when bidding on government contracts such as the Fort Polk food service contract, the recent past experience of a candidate represents a large component of the grading and eligibility criteria. Cantu asserts that Bailey will testify to that fact and can explain how Cantu's inability to develop recent past performance at Fort Polk (due to Frazier's alleged breach) has harmed Cantu's ability to win subsequent contracts. Although Bailey's expert report is not focused on Cantu's claim against Frazier, it nonetheless explores how past performance affects future contracts.[29] The court finds that Bailey may testify as to industry practices under federal public service contracts with respect to issues of past performance, contract extensions, and contract quality assurance and quality control processes.

---

[28] In Bailey's deposition, after being asked whether he was "offering any opinion in this case concerning Cantu's Services' claims against [Frazier,]" Bailey replied "No, I'm not." Ex. 2, Dep. of Johnathan Bailey (Rec. Doc. 201-2), at 88.

[29] "The degree to which Cantu will be impacted will vary from solicitation to solicitation as the evaluation criteria selected by the contracting officer and the relative weight she assigns to each criterion is a matter of discretion and varies. It is my experience in review of hundreds of solicitations for various services, construction and manufacturing, that although the precise relative weight given to past performance as an evaluation factor for award may vary, past performance is and will continue to be a major factor in virtually every award decision. In many instances, past performance is the only non-price evaluation factor for award." Ex. 1, Expert Report of Jonathon M. Bailey (Rec. Doc. 201-2), at 2.

4. *Limit Testimony of Harris to Alleged Damages Relating to Fort Polk*

Harris' expert report contains estimated losses for Fort Polk, Lackland Air Force Base, and Fort Lee. Frazier argues that he had no role in Cantu's failure to acquire the Lackland Air Force Base and Fort Lee contracts, and thus Harris' testimony should be limited to Fort Polk damages. Frazier further argues that any attempt to recover damages for alleged losses relating to Lackland or Fort Lee are directly contrary to Cantu's prior discovery responses. Cantu responds that because of the grading criteria used for federal public service contracts, Frazier's breach of contract directly affected Cantu's ability to secure future contract work. The court is persuaded that Harris should be allowed to testify as to estimated losses stemming from the Fort Polk, Lackland Air Force Base, and Fort Lee contracts.

CANTU'S DAUBERT MOTION (REC. DOC. 202)

Cantu's Daubert motion seeks to exclude the testimony of Terry Smith.[30] Cantu argues that Smith's report and testimony should be excluded because they (1) improperly opine on legal issues and (2) fail the Daubert requirements because of a lack of reliable methodology.

I.   *Improperly Opine on Legal Issues*

Smith's report lists the following expert opinions:

1. The blind vendor, Lee Frazier, did due diligence in considering proposals from companies other than Cantu Services and the process was consistent with best practices as outlined previously in this report.
2. The Louisiana SLA was within its rights to insist that the blind vendor consider proposals from other companies before making a selection.
3. The requirement that the Louisiana SLA approve the selection of the teaming partner is consistent with best practices utilized by other SLA's around the country.
4. The voluntary payment of a percentage of profits from the contract does not violate the Randolph-Sheppard Act.
5. SLA's are bound by the information provided on bid announcement; therefore by stating on the bid announcement that it had to approve the teaming partner it had an obligation to do so.

---

[30] Frazier provides that he will not submit the expert testimony of Catriona MacDonald and David Rost. Thus, Cantu's Daubert motion is **DENIED AS MOOT** in regard to Catriona MacDonald and David Rost.

Although Cantu specifically alleges that the first, second, and fourth opinions are inappropriate, it seems to maintain that the entire report reaches conclusions on legal issues that are reserved for the judge.

Frazier responds that each of these opinions is explained within the context of the customary practices of the industry at issue and Smith's own experience and practice. Smith cites to several cases for the proposition that courts routinely allow expert testimony concerning industry customs and practices when such testimony is deemed helpful to the trier of fact. *See Ergon-West Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419 (5th Cir. 2013) (holding that a district court had properly used expert testimony regarding trade usage in the gas industry); *United States v. Leo*, 941 F.2d 181 (3d Cir. 1991) (holding that a district court did not abuse its discretion in allowing expert testimony concerning industry customs in the field of defense contracting); *First Nat'l State Bank v. Reliance Elec. Co.*, 668 F.2d 725 (3d Cir. 1981) (allowing admission of evidence of customs and practices in the banking industry).

Smith may discuss industry practices and standards, but he cannot opine on legal duties. For example, in the first opinion, Smith can discuss due diligence criteria in the industry, but not whether Frazier did due diligence. In the second opinion, Smith can testify as to whether it is industry practice for blind vendors to consider proposals from other companies before making a selection, but not whether SLA was within its rights to do so. As for the third opinion, Smith can speak to what the best practices utilized by other SLA's around the country are, but not whether the requirement that the Louisiana SLA approve the selection of the teaming partner is consistent with those practices. The fourth opinion is a conclusion of law, but the issue is moot as the court has already found that the donations were not illegal or improper as a matter of law. For the fifth

8

opinion, Smith can opine on industry practices concerning bid announcements, but not whether the LWC was legally bound by the bid announcement in this case.

II.    *Lack of Reliable Methodology*

Cantu further argues that the testimony is inadmissible because there is nothing in the report to show the reliability of Smith's methodology, or how he applied that methodology to this case. Prior to the admission of expert testimony, a district court must ensure that a proposed expert witness meets the criteria set forth in Rule 702 which governs the admissibility of expert opinion testimony. FED. R. CIV. P. 702; *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993) (additional citations omitted)). Federal Rule of Evidence 702 was amended in 2000 "in response to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which 'charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony.'" *Seaman v. Seacor Marine, L.L.C.*, 326 F. App'x 721, 724 (5th Cir. 2009) (citing Advisory Committee Notes to FED. R. EVID. 702 (2000 Amendments) (citing *Daubert*, 509 U.S. 579)). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. A trial court has great discretion in making this determination as to both the expert's qualifications as well as to the reliability of the proposed testimony. *Roman*, 691 F.3d at 692 (citing *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010)).

Frazier responds that Smith's report draws on the more than thirty years he has worked in the development and administration of Randolph-Sheppard Act programs, and that the detailed knowledge in the report can only be acquired through years of first-hand experience. The advisory committee notes to the 2000 amendments to the Federal Rules of Evidence 702 recognize that "[i]n certain fields, experience is the predominant, it not sole, basis for a great deal of reliable expert testimony." FED. R. EVID. 702, Advisory Committee Notes to 2000 amendments. Moreover, in *Kumho Tire Co.*, the Supreme Court stated "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). The court finds that Smith has sufficiently extensive and specialized experience to opine on the relevant industry practices and standards in this case. Accordingly,

**IT IS ORDERED** that Cantu's Motion in Limine (Rec. Doc. 154) is **DENIED**.

**IT IS FURTHER ORDERED** that Cantu's Motion in Limine (Rec. Doc. 203) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Cantu's Daubert Motion (Rec. Doc. 202) is **DENIED IN PART** and **GRANTED IN PART**.

**IT IS FURTHER ORDERED** that Frazier's Motion in Limine (Rec. Doc. 201) is **DENIED IN PART** and **GRANTED IN PART**.

Lake Charles, Louisiana, this ___ day of _____, 2016.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

10